Mr. Bredehoff. Thank you, Your Honor, and good morning and may it please the Court. My name is John Bredehoff from the firm of Kauffman & Knolls, and I represent 1st Advantage Federal Credit Union, which was the defendant below and is the appellant and cross-appellee here. There are a few subsidiary issues in this case. Whether or not there can be a bailment by a general deposit of money, whether the court committed clear error on the 59e motion by not adding punitive damages, but mindful of the stare of Judge Albert v. Bryant Sr., I will cut, I think, to the heart of the case, which is what happens under the Virginia Iteration of Uniform Commercial Code when a wire transfer, or in this case an ACH, goes to a financial institution like the credit union and it has a valid account number, but the name doesn't match the account number. I wanted to ask you this. Is there a, in the course of the bench trial, did the district court make a finding of fact that an individual within 1st Advantage had actual knowledge? Was there a finding of fact that the district court made that addressed, that applied the actual knowledge standard on an individual basis and that there was some individual at the bank who understood the fact that the beneficiary's name did not match the name of the account? Was there a finding that an individual had actual knowledge of the mismatch? I reread the district court's decision last night and again this morning at 5 a.m. for that very point and I do not see such a finding. Rather, what the district court found was that an individual at the bank should have examined further. Well, but that's not what I'm asking. I am asking not what he should have done or could have done. I am asking whether the district court made a finding of fact that an individual at the bank had actual notice of the mismatch. And the answer to your Honor's question is no and that is why the district court's decision needs to be reversed because it imports all of these diligence and nebulous negligence concepts into the determination of whether there was knowledge of the mismatch, misdesignation of beneficiary. But that is exactly what the Uniform Commercial Code and the natural rules themselves, the National ACH Association, which is amicus in this case and supports our position, that is exactly what the Uniform Commercial Code says. There's a problem. I mean, Studco is an innocent party here. So were we. They're innocent. I know, but what I'm saying is that Studco, they correctly noted the beneficiary of the check and they wrote the check out in a proper fashion and they've done nothing wrong here and yet they're going to be saddled with the damage and the loss that was inflicted by the fraud. So does that aspect of it trouble you that Studco is completely innocent in its own behavior and that they are going to be left to bear the full brunt of the fraudulent activity? It has troubled me, but it is relevant to a 207 analysis. Now, let me drop a footnote, if I may, about the complete innocence of Studco. We've talked about contributory negligence. That doesn't apply to the statutory claim. It only applies to the common law claim. But did Studco do anything wrong? They didn't. Sure they did. Sure they did. If you look at this email that says, change our bank, I mean, there was supposed to be a change. It was supposed to be a change from J.P. Morgan to Bank of America. What they got was an email saying, change from J.P. Morgan to this 1,000 times smaller credit union that's not allowed to have customers outside of Virginia, Northeast North Carolina. And they got it in an email that had four punctuation letters, typographical errors, and it was from studco.net and said, in the signature block, the correct one, studco.com. Anybody who gets an email where the sending person doesn't match their signature should at least call. But you are under Virginia law, which adopted the UCC. It was promulgated, if I remember quite well, with it in mind that a bank or an entity such as yours, because if you got something and you had a bad name on it, or if the number is proper for the identification, that's going to be enough. And apparently that number matched whoever that person was up there. And Judge Wilkins is right. I remember that coming up. That turns into some bad situations where it feels like you know there's a mismatch or you maybe have a duty for the mismatch. But the UCC says if you do what that number says and it matches that up there, you're good. The UCC, in fact, Judge Wynn, says we impose no duty of inquiry, no duty of diligence in determining whether they match. There is no duty. Well, that's in order to accommodate the thousands and thousands of transactions that occur and are done by computer. Billions and billions. Yes. And apparently this record shows that there are thousands every day of mismatches at that particular institution. And that they can't look at 70,000 matches every single day and run them down. So the UCC, in order to facilitate the transfers of money between banks, relies on what Judge Wynn says is basically the account number, the ACH process. That's correct. Unless there's actual knowledge. And if there's actual knowledge of a mismatch, what would constitute actual knowledge? And is it the actual knowledge of the bank or is it individual or how does that factor in? That is an important question and I hope to spend a lot of time on it. Because the court below and the opposing brief for my colleagues across the bar spend a lot of time on Section 202F and say it imposes a due diligence standard. 202F talks about when a financial institution has knowledge, somebody there knows it, and then has to tell somebody else to take action. But, I mean, I suppose organizational knowledge would always be there. So I suppose your argument is for the actual knowledge standard to have any meaning, it would have to be an individual. Someone, a person. Somebody. And I come back to the question. My question was really a very simple one. Whether there was a finding that the district court made that any individual at first advantage had actual knowledge of the mismatch. And the answer to that. That's what I think. No. That's what you can argue that that's what the code requires. That is what the code requires, Your Honor. So the concern that I have, and I don't know whether it's a valid concern, but if we require manual checks and sort of take leave of the electronic capabilities and actually require manual checks on a name or on a mismatch as opposed to allowing the bank to consummate a transaction based on account numbers alone. I wonder if we're not just sending banking back into the dark ages and requiring banks to do something that is going to be quite laborious and is going to add a good deal of delay toward transactions. And along with that delay, there's going to be added expense that somebody is going to have to pay. Perhaps a depositor or whatever. But there would be fees levied one way or another to cover that delay. And so given the fact that an awful lot of banking transactions are conducted simply by the number on a check or the number on an account or what have you. And I'm wondering, is this really a crippling imposition upon banking practice? Or is this just a parade of horrors that's been thrown up before me? Or in real practical terms, is this a crippling imposition on modern banking as we know it? I think if the court has read amicus briefs, which include the National Association of Federally Insured Credit Unions, the National ACH Association, the organization which they're actually representing. But how real, I mean, tell me, how real is the danger? It'll come to a screeching halt. A screeching halt. Now the answer to that, that my good colleagues across the bench would say, is, well, little credit union, have your IT people go into the software that you bought to screen and change it around. Change the parameters. Make it catch only big problems. But, you know, we're not Bank of America. We're 1,000 times smaller than Bank of America. That would impose an error rate, I think, that would be even worse. But more than that, their expert testified at trial that the use of the software we use, which is out of the box, we didn't change it. Most credit unions, over 1,000 credit unions in the nation use it. It's recommended by the National Credit Union Administration. It's not negligent. Well, negligence is not the standard under this, right? It is not. Nor is due diligence. I mean, if you look a little broader under the nature of our regulations, the whole checking system relies on the very same principles. Correct. You write a check, and the person who dealt with the thief ultimately bears the loss, unfortunately, and the people in between are protected by the process established by the code. And here, the person who dealt with the thief was Studco, unfortunately, and I suppose they were innocent in the sense that they trusted the e-mail, but a little telephone call or a confirmation e-mail to Olympic would have solved the whole problem. Or even sending an e-mail to the address they had on file for Olympic because they'd been dealing with them for many years, and the guy who purportedly sent the e-mail but didn't visited there once a month. Let me ask you a question about your privity argument, if it's before us properly. Yes, sir. If your argument, if we accept that privity argument, and you say it's Studco's bank that ought to be the one that actually is dealing with this, and that is who they should sue, why would you make no effort, or did you make any efforts to have that bank brought in as a necessary party? Because it seems like I don't see how your entity cannot be a party because that bank would still have to show you had actual knowledge of it, I think, and it would probably want to recover from you, I would think, in order to be able to do it. But I'm just dealing with the privity argument that if that exists, then it seems like to me you would have moved to have them added as a necessary party. Well, we didn't do that because we knew we had no actual knowledge. But you're right, Judge Wynn, because the statute says who's liable. And, Judge Wilkinson, this goes to your earlier question about what if they are innocent. The statute says there are two people who can be liable, the beneficiary, which is our member who is impecunious, or their bank. Their only argument to that, what Natchett calls the privity argument, is that we didn't make it. But if you look at our reply brief, our proposed conclusions of law, Joint Appendix 503-504, goes on and on about how you cannot recover from us, you must look to your bank. I have about 20 seconds in which I'd like to distinguish all 14 of the cases they cite. Can you do that on rebuttal? I can, and I will, and I will end early. I'll ask my co-panelists, Judge Niemeyer, do you have any?  Okay. Mr. Patel, we'd be pleased to hear from you. Thank you, Your Honor. May it please the Court, my name is Chirag Patel, along with my colleague Mariah Jaworski of the Law Firm Clark Hill, on behalf of the Plaintiff Appellee Studco Building Systems. The District Court, sitting as the fact finder in a three-day bench trial, heard from First Advantage's head of compliance, head of ACH transactions, and Studco's expert witness, the former president of Natchett, the organization in charge of creating the ACH rules, and correctly held in favor of Studco on its UCC misdescription of beneficiary and its bailment claims. The misdescription of beneficiary claim concerns First Advantage's processing and deposit of Studco's funds, while the bailment claim concerns First Advantage's failure to care for those funds after they were deposited in the customer's filing account. Do you agree that actual knowledge is required? Your Honor, the standard for knowledge for an organization is set forth in 207 and explained in the comments. So in 207, it says that a bank only has knowledge for a misdirected transfer if they know that the number of the intended beneficiary in the account number doesn't match the account. Do you agree that that's actual knowledge? What the statute says, and this is in the comments, is that there's a standard for organizational knowledge, and so what the statute says is that if a person knows about it, then there's actual knowledge. However, the code points you to 1-202-F, which imputes knowledge to the bank at the time the misdescription would have been brought to the bank's attention if they had exercised due diligence. The code says that organization exercises due diligence if it maintains reasonable routines for communicating significant information to the person conducting the transaction, and there's reasonable compliance with those routines. So there is an organizational standard that is embodied within 207, and it points the reader to 202-F. When you read these together, it makes it clear that the misdescription must be known by the person conducting the transaction to have liability. However, the bank must also have reasonable routines in place to communicate significant information that would lead the bank to obtaining knowledge of the misdescription. And on this point, I'd like to point to... I mean, I guess one could think we're talking about who has to have the knowledge, and we're talking about an individual or an organization or whatever. But regardless of that question, the ultimate standard is one of actual knowledge, and it's under the code here. And when I looked at the district court opinion, there were an awful lot of statements about what the bank should have done or might have done, and there were statements about what was a commercially reasonable practice, and there were allusions to reasonableness and everything. And much of the opinion sounded to me in negligence rather than actual knowledge, and there were disconcerting references to commercially reasonable practices or that kind of thing. And there may be... You know, one can argue about whether the Data Safe program was a reasonable practice or whether it wasn't, but I just thought that so much of the district court's opinion bottomed out on reasonableness and on negligence phraseology. And I'm troubled by that. Sure, Your Honor. The commercial reasonableness language, that all relates to the bailment claim, but I want to point the court specifically, the comments state that there needs to be reasonable routines to convey information within the organization. And I'd like to read just one quick sentence from a Tenth Circuit case, the First Security Bank versus New Mexico versus Pan Am Bank. And they say that although a bank has no duty to affirmatively search for conflicts between the beneficiary names and account numbers for incoming wires, it may not escape liability if, before it pays the wire, it gains knowledge of the conflict by any means. And this strikes the balance because it considers the bank's right to automated processing of wires. However, if there's information that comes into the organization that tells them that there's a misdescription of beneficiary... Arch, isn't the likely consequence of your position that the bank would be required to sort of manually go through deposits for evidence of a mismatch when so much banking today is done by numbers? A bank will look at the number of the check and a bank will look at the number of the account. And that's critical to commercial processing. And if you have to go with a manual check and you say, well, the numbers are insufficient and we're going to go by whether the names match or mismatch, well, names shift all around. I mean, some people, their names, their middle initial may be missing or there may be a letter missing or some people write out their full name and others don't. So is manual review what you're asking for? Absolutely not. All we're asking for, which is consistent with the district court's finding, is that the banks will continue to continue automated processing. However, if they receive extrinsic information that there is a problem, they need to convey that to the right person so they can stop the transaction from occurring. That's what the UCC says. The argument is that the data safe program sends forth these warnings. Okay, and that the warning is a notice of sorts. But the argument is, well, the data safe program does emit these warnings, but that they are absolutely voluminous and that they're just overwhelming in their number and there's so many of them that it's, in effect, not much of a warning at all. So... You know, that contention was rejected by the district court and that was a contention that was made by the witness during the hearing. But then on cross-examination, I asked her, I said, well, of those warnings, how many of those actually relate to mismatches? And the testimony was, well, we don't look at them, so we don't know. And they conceded that there was all kinds of different warnings. I thought there was evidence that just at this bank there was over, I don't remember the number exactly, 70,000 every day. They said that there were hundreds to thousands in very broad terms of just warnings. And then if you look at the full record, including the cross-examination... And the problem is, you know, if they left a junior off of a name or they left a middle initial out or whatever these warnings may alert or they used John instead of Jack or... In other words, to match these names with the account numbers, the account numbers are unique and the system is dependent on that. And it seems to me that what the system is designed to do is to let the numbers govern unless they have personal knowledge of a significant problem. And there's no finding of that in this case. So it really comes down to you're requesting a greater or a different method for receiving ACH deposits. And the ACH deposits are probably in the millions or billions every day. That's the essence of the whole banking system. But even at this bank, the bank couldn't operate. They would just collapse if they had to monitor the differences in the names of every deposit. As a matter of fact, that contention was rejected by the district court. And the district court, as fact finder, was closest to the facts in this case. The district court, again, found that there was insufficient support for the contention that it would be untenable for them to be able to review them. And to the contrary, our expert witness testified that they would be able to review the set of filters. Doesn't that get into a negligence inquiry as to what the bank should have done or what the bank could have done or what have you? Doesn't that stray from the actual knowledge standard into a different negligence-based inquiry as to what the bank could do or might do or whatever? Because that is different, I think, as to whether an individual has actual knowledge. You see my question? I understand your question. The organizational knowledge standard is within the statute. It's explicitly and expressly referenced within 207, and it states that organizational knowledge is either actual knowledge or when information would have been learned if the entity had exercised due diligence in communicating significant information. But on that point, look at the UCC commentary to Section 202, which I think is Virginia has adopted the commentary to the UCC2. And it gives the example of a bank or an entity in which a clerk, the question whether a clerk has knowledge or notice in Department A, that would only exist if that notice goes to Department B only if it's directly communicated to A. So in other words, this business of organizational knowledge is not a constructive knowledge. It has to be actual knowledge, and that section right there implies that it has to be from employee to employee to make sure it's being communicated to the one that's supposed to be getting the knowledge. So that has to be alleged and has to be shown in this case. Don't you agree? That provision supports our argument, Your Honor. That provision says that notice is effective from the time that employee A communicated that information to community B or should have communicated that information. Yeah, but see, all of F under 202, all of F is directed at when a particular employee gets notice, how does the institution get notice? And it provides the structure when it should have in the structure. But it still rests on the initial proposition that even the individual had to have, that some employee had to have actual knowledge of the problem. If you look at the definition of organizational knowledge within the statute. Well, that's what I was looking at, and Judge Wynn was just reaffirming, it seemed to me in the commentary, that notion that the problem that is being addressed is when an employee, let's say a very low-level employee sees something, is that imputed to the corporation or the entity? And the answer is it may be based on seven, which is a should have, should that employee have notified and who would have notified. But it still starts with the notion that the employee had actual knowledge. Sure, Your Honor. So I want to make one thing. That's, the standard is correct. And in fact, the standard says that as long as they establish these routines and they follow those routines, even if the information doesn't get there, the bank is still not liable. So it provides them some protection, and that prevents the issue that is here, which is where banks will create silos to prevent the transition of information from happening because they want to avoid liability. But I also want to point out that it wasn't only the information within the warnings that the district court found created that knowledge. It was not only that. It was information that was obtained by the interactions with the customer when she opened the account that would have given them information. It was the interactions with the tellers that was highly suspicious. It was the other warnings that were created by the computer system that First Advantage said should have been looked at by an individual. So there's all these human interactions that were looked at that would have led them to have significant information that would have led them to find the misdescription of beneficiary. Are you suggesting that a bank would deliberately set up a system whereby only one entity within it would learn it and not communicate it on purpose to another one to avoid the actual knowledge? Your Honor, that was what the amicus argued. The amicus said that if you imposed a due diligence standard, it would impose liability on us for making an effort to communicate information. Under your theory, there's always going to be actual knowledge on the part of the organization whenever a warning is set off by the data safe system. That that would be sufficient, simply the warning from the data safe system, that would be sufficient, as I understand your view, or it would at least be argued to us in future cases, that that would be sufficient to establish organizational knowledge. And that seems to me a very broad proposition. And what's nagging in me at bottom end of this case is that I think in the present day that banking is done by the numbers. And that's what makes the system efficient and that's what makes it go. And I don't want to strike at that basic proposition that in our modern age that banking and commercial transactions are done by the numbers. And the concern I have is that it may result in an individual injustice on occasion. And I think that the plaintiff's case has a lot of sympathetic aspects to it. And I'm drawn to it as a matter of equity perhaps. But sometimes you have to have a result that you're not all that happy with in terms of what the plaintiff is asked to absorb in terms of a loss. But we do this for a larger public good. And that is efficiency in banking transactions that allows many, many, many different parties. Or they would otherwise pose to many different parties a great deal of delay and a good deal of expense. And so what it seems to me we're asked to put up with a result that I'm not thrilled about, okay? But to do so because there's a larger public good involved. A larger public good being or maybe danger being striking at the fundamental characteristic of commercial transactions which take place by the numbers and the numbers of more reliable gauge in most cases than possibly shifting names. I've taken up a good bit of time with my question, so I'm going to give you some extra time. But I'm trying to be quite honest with my concern about what it is. Your Honor, I think the response that I can give to that is that even in a situation, once again, the district court did not only rely on the reports that were in the systems. They also relied on information that was received by human beings at the banks that were suspicions and that the court found, as a matter of fact, which should have some deference, that that information should have been communicated to stop the ACHs. However, what the UCC says that as long as they establish reasonable routines for communicating that information and that they follow those routines, even if the information doesn't get there or if it gets there late, they're still off the hook. And so they can continue to process everything in an automated way. And all they have to do is if they receive significant information, and what may be significant could be different on a case-by-case basis, they just need to have a reasonable routine for communicating that information to the person who's conducting the transaction. If they do that, even if it falls between the cracks, there is no liability. So the liability in these instances will be very rare. It will not slow down the banking system at all. It's only in the rare cases like this one where you have significant instances where there are warning bells, red lights. Well, how do we define? You're asking us to add a judicial standard of significant, I don't know what we're going to call it. And how do we define that in view of the fact the way the code treats these things? In other words, we have thousands and thousands daily of these misdescriptions. And the question is how do we determine that they're significant? I guess your answer is that we then put in additional computer systems to analyze them. And then do we do that based on whether the name is totally different or is just partially different? I mean, I'm not sure what you would require. And then if we're doing all that, wouldn't we be rewriting the code? All the language I'm using is in the code. Significant information to convey is in the code. Where is that? Significant information is in 1-202-F and it says that organizational standard. I know, but I think you're misreading 2-F. F, I think, is how to get actual knowledge by an employee imputable to the entity. In other words, it's addressing the situation of how does the entity have actual knowledge from its employees. But I don't think that imposes a standard on the system of discovering misdescriptions and mismatches and whatever we have. And what impresses me is that in this bank alone, I wish I had the number at hand, but in this bank alone, every single day we're talking about many, many thousands, tens of thousands of mismatches. And the question is, there's no way, no standard that's currently established to define what a big mismatch is and what a little mismatch is. I mean, the mismatch may be just a husband and wife and they have the same account. So you have Mrs. Jones and Mr. Smith. They happen to be married and using their professional names. I mean, would that be significant? Do I have to stop the whole system and pull it out? There's as many mismatches as there are in what we all write names or describe accounts. One's a trustee. They write the word trustee on one check and there's no trustee on the other check. You can just go through them and figure out how that would be irrelevant or actually bogging down the whole banking system. And so if you go by numbers which are unique, that's a certain way to do it. I mean, they could leave off the name. They happen to provide the name of the account. You know, the thesis I think of the UCC, and I'm just adding a little bit to what Judge Wilkinson observed, the philosophy of the UCC is that to facilitate commercial transactions, we put the burden on the person who dealt with the thief. And whether it's in checking accounts or the ACH or whatever. And in this case, the burden has to fall or does fall legally under the code, I think, to STDCO. And STDCO last dealt with the thief. And the question is could STDCO have avoided it? Maybe. A few little checks would have probably avoided it. But STDCO was somewhat, it was a victim, but so was First Atlantic a victim. And so were the intervening banks who transferred this. Who was J.P. Morgan? They were the originating bank. So they are a victim too. I mean, because they transferred an account with a mismatch. And it could have been along any number of banks in the system. And they would have all been delivering mismatched accounts. And we just can't isolate that and impose that kind of liability and have a sophisticated banking system. It seems to me that's my big take on this is that equities are always difficult in these types of commercial transactions. And STDCO was clearly victimized. I looked at that letter and I know your opponent points to all the little things. I don't know if I would have observed all the missed periods and things like that. I might have noticed the different addresses, website addresses. But I think when a whole relationship, a banking relationship has changed, to pick up a telephone call and call Olympic and say, is this something we should be concerned about? Are you going out of business? Do you need extra money, credit, or whatever? And I would have uncovered it. Anyway, it's a difficult case. It raises, and of course the code is always a very detailed, thought out process. And I think all the states have virtually adopted the code. So there's uniformity there. I'm well over my time. I can respond. If the judge will. Of course you have time to respond to that. I always like to give litigants the last word. So please respond. I appreciate it, Your Honor. Thank you. I'll just note a few things, Your Honor. The court, again, made factual findings and they were close to the facts that related to STDCO being the victim of the fraud. And they found that there was no evidence that we breached any duty of care in sending the email. So the first advantage did not establish a duty of care. They argued contributory negligence. They did not establish that our cybersecurity practices, us falling for the email, fell below any duty of care. So we were entirely the victim in this case. Second, I want to reiterate that the information that the district court relied on, providing knowledge, was not just the warnings in the systems. It was human interactions with the banking customer that was conducting the fraud. That was, again, these are factual findings. The district court was in the best position to observe the witnesses of both first advantage and also from our expert witness. And they said that based on what was happening in these accounts and that the tellers, they were trained to detect this, but they should have seen it. They had systems that created warnings that were reviewed daily by individual human beings. And if they looked at it, that information would have been conveyed. So this is a very rare and unique case. We're not just talking about information within a system. We're talking about multiple interactions. I think the customer was at the bank at least 15 times in every one of those interactions. And if you look at the record, it shows that they admitted that all of these were suspicious transactions. And as the Tenth Circuit said, any means that leads the bank to the misdescription creates knowledge. You're looking at hindsight, too, because they did ask her about the money. And she explained she was in a real estate operation, newly employed, and would have these transactions. And so as you know, real estate does use money in the range of $100,000, $50,000 at a time. And I think wasn't that our explanation? That was a factual finding. And the facts as reviewed by the district court were that that was suspicious enough to cause it. And that is not clear error, and they haven't established that was clear error. So I think if we're talking about the standard, that may be a no-go. But when we're talking about what the court observed as being sufficient to create that knowledge, that should be the court's deference to the lower court on that issue. Thank you very much. Thank you, Your Honor. Do you have some rebuttal time, sir? Thank you, sir. The question, with respect, Your Honors, is not whether there were fishy things going on with the account. There really weren't. The first thing that they say was fishy, she had two other accounts. She'd been with us since 2010. There was a discrepancy in the address. That was the first thing. They checked it. They fixed it. All of these other fishy things, one was an Office of Foreign Asset Control alert about an outgoing transfer that turned out to be a false positive. We cleared that. None of them were anything to do with the incoming money or with the knowledge that the account number did not match the beneficiary. These were all BSA, Bank Security Act things, and there's no right of action to enforce the Bank Security Act. We remain with the law, and I'm uncomfortable about this to some extent. As a matter of curiosity, was the real culprits ever run down? No, they were in Dubai, Nigeria. So they got away with about half a million bucks. More than that, a little bit more than that, Your Honor. Your argument kind of at bottom is that numbers are more important than names, and that probably is where we are in this world, at least as far as commercial transactions are concerned. Hold on a minute. As far as commercial transactions are concerned, that numbers probably are more important than names, it's a sad development and an impersonal development in my view, but I think that Judge Niemeyer makes a good point when he said that the code has as a basic emphasis efficiency in transactions and allowing transactions to go forward in a less impeded way, but I guess this is an environment in which the modern commercial world finds itself, and it's not an altogether happy development, but I understand your argument about the broader consequences that would ensue if we started fooling around with the ability of banks to process deposits based on account numbers. I think when we depart from that, that carries significant risk, but it's just not all that happy situation. It's an impersonal situation, and it's not the way commercial transactions used to be. I am never happier than when I go to the bank basement of my office in Norfolk, and they all say, hello, Mr. Bredehoft. I like it when we know the people we're dealing with. Unfortunately, when we don't know or we have reason not to know, we need to be careful, but the first thing, Judge Wilkinson, that you said is that names are less important. Comment number two says that. It says the name, quote, plays no part in the process of payment. Judge Niemeyer, your analysis, of course, of 202F is exactly on point. It deals with when someone has knowledge within the organization, whether that's imputed to the organization, and most of what I was going to say the first time around was that every case cited on page 33 and 34 of their brief for this organizational standard deals with that, not with whether the organization should have had diligence to get knowledge, but moving the knowledge within the organization. The PAF case, for example, two certified letters were sent to the organization, but they didn't go to the right person. Well, that was imputed. And the other cases are to the same effect. Their cases, they reject a due diligence standard or a duty to obtain notice about the mismanagement. That's the Wells Fargo case, the Shapiro case, the Valdez case. They're all the cases that they cite. We cite 10th and 11th Circuit cases, First Circuit Bank, and Weatherall. They're all to the same point. All right. Thank you. Your Honor, if I might have 10 more seconds to address a question. Yes, you may. I normally wouldn't ask. Judge Niemeyer, the testimony about the warnings was a question, why don't you read all the data-safe warnings and mismatch names? Answer, because the system generates so many, it wouldn't be a benefit to do so. Question, how many does it generate? Hundreds to thousands. It depends on how many transactions. So those are all mismatch names, and it's hundreds to thousands a day. Thank you. Thank you. I appreciate the court's attention. Well, we thank you both. We'd like to come down and greet counsel. Then we'll proceed into our final case. Thank you so much, Your Honor. I appreciate it. I'm honored to have you before me. Thank you so much. We have our support in this court. Thank you very much. It's been a while back. That's true. I was on the court. I forget how old. You, sir? Nice to see you. Nice to have you here. I'm sure you're aware. Thank you. I'm sure I am. I'm so happy. Thank you. Thank you.  While they're changing, I'm just going to call you. Well, you and I are going to take a break. Whatever you want to do. Why don't we just take one? Move forward, pal. Would you like me to call recess? Yeah, we just do. This honorable court will take a brief recess. Thank you. Thank you. Thank you. Thank you.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, James Andrew Wynn